Patrick J. Neligan, Jr.
David Ellerbe
Nancy Ribaudo
NELIGAN FOLEY LLP
Republic Centre
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

PROPOSED COUNSEL FOR DEBTOR AND
DEBTOR-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO.   08-31790-11** |
| | § | |
| **KEYS FITNESS PRODUCTS, LP** | § | **CHAPTER 11** |
| | § | |
| **DEBTOR.** | § | **HEARING:  4/17/08** |
| | § | **TIME:        2:00 P.M.** |

## DEBTOR'S MOTION FOR INTERIM AND FINAL ORDER (1) APPROVING POSTPETITION FINANCING WITH JP KFP ACQUISITION, L.P., (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING OF LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING  OF ADEQUATE PROTECTION, AND (5) SCHEDULING A FINAL HEARING

Keys Fitness Products, LP, as debtor and debtor in possession ("Keys" or the "Debtor"), hereby moves for entry of an order under sections 105(a), 361, 362, 363, 364 and 507 of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (i) authorizing the Debtor to enter into a financing arrangement with JP KFP Acquisition, L.P. ("Senior Lender" or "JP Acquisition") to obtain secured postpetition financing on a superpriority basis ("DIP Financing"), (ii) authorizing use of cash collateral, (iii) granting liens and providing superpriority administrative expense status, (iv) granting replacement liens as adequate protection, (v) modifying the automatic stay to the extent necessary to implement the postpetition financing arrangement, and (vi) scheduling a

final hearing with respect to the relief requested herein (the "Motion"). In support of this Motion, the Debtor relies upon the Declaration of Reagan Stewart, Chief Restructuring Officer of the Debtor (the "Stewart Declaration") filed with the Court concurrently herewith. In further support of this Motion, the Debtor respectfully represents:

## I.
## PRELIMINARY STATEMENT

1.      Keys is in the business of designing and manufacturing exercise and fitness equipment. The Debtor sells its products through more than 3,000 retailers in the United States, as well as to stores in Canada and elsewhere worldwide. Due to business exigencies described more fully below and in the Stewart Affidavit, Keys must obtain debtor-in-possession financing to sustain its ongoing business operations to ensure that Keys is able to deliver its product to customers on a timely basis. Keys also has a critical need to use cash collateral to meet its payroll obligations and to satisfy other immediate and necessary working capital and operational needs. Keys has thus sought the postpetition financing and use of cash collateral set forth in this Motion in an attempt to avoid the immediate and irreparable harm as a result of failure to deliver products timely and failure to pay its ongoing payroll and other necessary expenses.

2.      The exercise, fitness and leisure industry is a highly competitive segment of the retail market. Keys, which manufactures exercise equipment under both "Keys Fitness" and "Ironman" brand names, has enjoyed a well deserved reputation as a supplier to retailers of high quality, value-priced exercise and fitness equipment. Notwithstanding a hyper-competitive retail marketplace in which suppliers' margins have continually eroded over the last three years, Keys has maintained its brand and customer loyalty.

3.      Keys, which sells to some of America's largest retailers as well as to smaller regional and local retail sports chains, has been fortunate in having its product heavily promoted

by some of its major retail customers. As a condition of these promotional efforts, Keys must ensure that its retail customers receive Keys' products on an "as ordered" basis. As an example, one of Keys' major customers, a national retailer, sells a substantial percentage of Keys products online through that retailer's website. The retailer's customers, who order Keys' equipment online, expect the Keys equipment they have ordered to be delivered within a couple of days from the date they placed their purchase order. Accordingly, Keys must be ready to immediately ship its equipment once an order is placed or risk losing significant sales - and potentially losing one of its largest retail customers. Keys cannot afford to breach its agreements with its retail customers by failing to timely deliver its product.

4.      Currently, Keys' inventory levels are not sufficient to meet projected customer demands. To ensure additional inventory is shipped to Keys in the next few days, Keys must issue by Friday, April 18, approximately seven letters of credit to purchase inventory from its major foreign vendors. Failure to obtain this equipment could destroy one of Keys' largest outlets for the sale of its exercise equipment. Because the suppliers of this exercise equipment are almost exclusively located in Taiwan and the People's Republic of China, Keys must issue these letters of credit to ensure that the vendor ships inventory to Keys in time for Keys to meet its own obligations to retailers selling Keys' exercise and fitness equipment.

5.      These seven letters of credit, which will be issued by Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to a separate court-approved debtor-in-possession financing, must be issued this week to avoid irreparable harm to Keys' ongoing operations. The total amount of letters of credit to be issued will not exceed $1.8 million. Unfortunately, despite ongoing efforts over the last year to reduce costs and improve liquidity, Keys cannot fund these critical letters of credit from its projected cash flow. While this Motion also seeks the use of JP Acquisition's

cash collateral, Keys cannot fulfill its obligations to its retail customers without approval of the proposed debtor-in-possession financing from the Senior Lender. Contemporaneously, Keys is also seeking approval from this Court for a motion to approve a letter of credit facility from Wells Fargo.

6. The proposed debtor-in-possession financing allows Keys to draw down funds under a debtor-in-possession credit facility provided by the Senior Lender. Keys will deposit these funds at Wells Fargo to secure the letters of credit issued by Wells Fargo. The funds on deposit at Wells Fargo will equal 110% of the amount of the letter of credit to cover both the amount drawn down on the letter of credit and all transaction costs arising from issuance of the letter of credit. Upon a vendor's presentment for draw down of the letter of credit, Wells Fargo will advance funds equal to the letter of credit to the Keys vendor and then offset Keys' funds that will be deposited at Wells Fargo immediately before it issues the letter of credit. Although the Senior Lender is provided the traditional protection afforded a DIP lender, the post-petition lien and superpriority claim provided the Senior Lender will be junior, in all respects, to the funds on deposit at Wells Fargo. Wells Fargo, as the issuing bank, will have a first priority lien on any and all funds on deposit at Wells Fargo that secure the letters of credit it has issued.

## II.
## JURISDICTION AND VENUE

7. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue in this District is proper under 28 U.S.C. §§ 1408 and 1409.

8. The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 361, 362, 363, and 364.

# III.
# BACKGROUND

## A.    General Procedural Background

9.    On April 14, 2008 (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code. The factual background regarding Keys, including its business operations, its capital and debt structure, and the events leading to the filing of its bankruptcy case, is set forth in detail in the Stewart Declaration.

10.    Keys continues to manage and operate its business as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108.

## B.    The Debtor's Business Operations

11.    Keys is a Texas limited partnership formed in 1988 with its principal place of business in Garland, Texas. Keys began as an importer of weightlifting equipment and quickly expanded its product line to include treadmills, elliptical machines, stationary exercise bikes, home gym weight machines, and other exercise equipment. By 1996, Keys' sales had grown to $50 million per year. In 1997, Keys opened a manufacturing facility in Tyler Texas. At its peak, Keys employed over 120 people and Keys Backyard, L.P. ("Keys Backyard"), a separate but related company, employed over 170 people. Currently Keys has approximately 90 employees.

12.    In 2003, Keys began exploring ways to reduce its costs due to increasing competition. In 2004, Keys began outsourcing the manufacture of its treadmills to China and by 2005 Keys closed its Tyler manufacturing facility. Keys explored other avenues to reduce costs, (e.g., using temporary employees to handle a seasonal surge of sales).

13.    In December 2005, Keys expanded its product line by establishing Keys Backyard to purchase a spa business from Icon Health & Fitness, Inc., though its subsidiary, Jumpking, Inc. ("Icon"). By 2006, Keys' annual sales exceeded $100 million. However, competition in

Keys' industries increased dramatically during the last 10 years. Profit margins steadily declined, even as sales steadily increased. Keys utilized additional sales opportunities such as Internet sales, which now account for 20% of sales. Nonetheless, falling profit margins left no room for error. Furthermore, sales for the spa manufacturing business have decreased significantly over the last eighteen (18) months.

14.     Further, Keys' major retailers selling its product have liberal customer return policies. Keys' largest retail customer requires its vendors to accept the return of any product, even if the product is not defective. To continue doing business with these major retailers, Keys and Keys Backyard were required to honor returns and pay for defects, including defects related to the spa business Keys Backyard purchased. Problems with the Icon spas which were manufactured prior to the acquisition by Keys Backyard produced substantially higher return costs than Keys Backyard had reserved when it purchased the spa business from Icon. Thus, in 2006 the spa business, which was operated by Keys Backyard, lost $7 million. These losses continued throughout 2007. During much of 2007, Keys and Keys Backyard were marketed to potential buyers.

15.     In late December 2007, Keys Backyard sold substantially all of its assets to The Great Spa Manufacturing Company, Inc. d/b/a Infinity Spas ("Infinity"), an unrelated third party. Infinity assumed all warranty claims of Keys Backyard as an integral part of the sale agreement. Other than Infinity, no other potential buyer was willing to go beyond preliminary due diligence.

16.     Keys also encountered increased raw material and freight costs during the last several years. As the price of diesel fuel rose, freight charges skyrocketed. Likewise, steel and other metals used in the manufacture of Keys' exercise equipment has increased exponentially over the past five years. The rise in petroleum costs has also increased the cost of plastic resins

used by Keys in the manufacture of its exercise and fitness equipment. Keys has not been able to offset these increases in costs through price increases.

## C.     The Debtor's Prepetition Debt Structure

17.     In 2005, Keys entered into that certain Second Amended and Restated Loan Agreement (the "Loan Agreement" and, and together with all related documents and agreements, the "Prepetition Loan Documents"), dated August 19, 2005, together with Keys Health & Fitness, LP ("Keys Health")[1]. The Loan Agreement was subsequently amended to allow Keys Backyard to draw down on the loan. Under the Prepetition Loan Documents, Bank of America, N.A. ("BoA"), as lender, agreed to provide Keys, Keys Health, and Keys Backyard (collectively, the "Borrowers") with certain loans, credit extensions and other financing arrangements. The Loan Agreement provided for a credit facility up to $22,000,000 in the form of advances and letters of credit to fund working capital and other business purposes (the "Working Capital Facility"). The Working Capital Facility was secured by a first lien on all of the Borrowers' personal property including cash ("Cash Collateral").

18.     As a result of liquidity problems arising out of its acquisition of Icon's spa business, Keys and the other Borrowers failed to meet various covenants and other requirements under the Working Capital Facility. During much of 2007, Keys operated its business in a workout atmosphere in which BoA closely monitored the Borrowers' business operations and reduced availability under the Working Capital Facility. In December 2007, BoA notified the Borrowers that, because of a default, it would no longer advance funds as BoA had previously done for the Borrowers. During early December 2007, JP Acquisition approached BoA regarding the acquisition of all of BoA's rights in the Working Capital Facility.

---

[1] Keys Health, which was originally set up for the manufacture of exercise equipment in Tyler, Texas, is not an operating company, has few, if any, assets, and accordingly, did not draw down on the Loan Agreement.

19.     In mid-December 2007, BoA and JP Acquisition entered into a Participation Agreement (the "Participation Agreement"), whereby JP Acquisition agreed to purchase BoA's rights under the Working Capital Facility on or before January 4, 2008.  In connection with the execution of the Participation Agreement, BoA advanced an additional $2,000,000 under the Working Capital Facility at JP Acquisition's behest.

20.     Pursuant to that certain Assignment of Loan Documents and Liens, dated as of January 4, 2008 (the "Assignment"), JP Acquisition purchased the secured Working Capital Facility from BoA and stepped into BoA's position as the Debtor's secured prepetition lender. Since the Assignment, JP Acquisition and Keys have entered into several forbearance agreements that have allowed Keys to continue to its operations and to restructure its financial obligations.

21.     The Working Capital Facility is undersecured based on various internal valuations performed in 2007. As of the Petition Date, the amount owed under the Working Capital Facility was approximately $13.2 million dollars.

**D.      Keys' Need for Use of Cash Collateral**

22.     In addition to the proposed debtor-in-possession financing, Keys also requires immediate use of the Senior Lender's Cash Collateral for continued operations.  In the ordinary course of business, Keys' next payroll is April 18, 2008.  Absent an order from this Court authorizing the emergency use of Cash Collateral to fund payroll and other critical expenses at this time, Keys will lose employees who are vital to its business and reorganization efforts.  In addition to funding payroll, Keys must pay shippers, customs and other critical expenses to ensure the release of inventory that is currently sitting on docks in locked storage.  At current levels of sales, inventory and collections, Keys' revenues, which constitute JP Acquisition's

Cash Collateral under the Working Capital Facility, are insufficient to support Keys' ongoing business operations.

23.     As an integral part of its request for use of Cash Collateral, Keys has prepared a budget on an interim basis ("Interim Budget") to cover the first three weeks of Keys' chapter 11 proceeding.[2] Keys has set out different categories for various necessary expenses projected to be incurred during each week. Pursuant to the proposed Interim Budget, Keys is seeking approval from the Senior Lender and this Court for the use of Cash Collateral during what Keys management hopes is a relatively short chapter 11 proceeding.

24.     Any cash collateral budget, especially one prepared at the outset of a chapter 11 proceeding, hinges on certain assumptions that management believes are reasonable. These assumptions, based on the chapter 11 debtor's prior sales history, cost structure and projected collections, are ultimately an estimate and often are revised during the case to account for unanticipated events. While Keys management believes its customer support will remain strong throughout its chapter 11 proceeding, Keys recognizes that if collections are slower than usual, it may require additional financing. Nonetheless, Keys has assumed for its proposed Interim Budget and Final Budget that sales and collections for this time period will continue at levels substantially similar to past years.

25.     Unfortunately, Keys is entering a historically slow period. As a general rule, the high season for fitness equipment is November through March. As the weather turns warm, the buying public will often forego purchasing exercise equipment, opting instead for outdoor activities. Likewise, the general decline in the United States' economy has had a major impact on the sales of Keys' product line. The increase in foreclosures and the crisis facing capital

---

[2] A true and correct copy of the proposed Interim Budget is attached hereto as **Exhibit "A"**. The proposed budget to be used in the Final Hearing ("Final Budget"), as defined herein, is attached as **Exhibit "B"** to this Motion.

markets in the U.S. have adversely affected the fitness and leisure industry. Purchases of exercise, fitness and leisure equipment are discretionary and suffer when the American public perceives a weakened economy. Accordingly, Keys' management may have to revise its proposed Final Budget at the Final Hearing, as defined herein, on this Motion. However, Keys is prepared to operate within the proposed Interim Budget for the next three weeks.

26. JP Acquisition, which has stepped into BoA's liens, rights and remedies, holds a first priority lien on virtually all of Keys' assets. As required by the Bankruptcy Code, Keys must provide JP Acquisition adequate protection for the use of its Cash Collateral. Keys has offered as adequate protection to JP Acquisition a replacement lien on all new inventory, accounts receivable and other assets. The proposed replacement lien provides JP Acquisition with a lien on the same type of assets that were otherwise encumbered by its pre-petition lien. Hence, JP Acquisition will receive a replacement lien on account receivables generated by post-petition sales of pre-petition inventory that was otherwise subject to its prepetition lien. Because JP Acquisition is providing additional funding beyond the revenues that constitute its Cash Collateral, JP Acquisition will also be entitled to receive a lien on all of Keys' assets and a superpriority position to secure JP Acquisition's postpetition financing. In so doing, JP Acquisition is priming its own pre-petition first lien. Put differently, no other secured lender is harmed by the granting of a replacement lien for adequate protection.

**E. Terms of Proposed DIP Financing**

27. Pursuant to this Motion, Keys seeks authority to enter into that certain Debtor-in-Possession Loan Agreement (the "DIP Loan Agreement" and together with all related documents, the "DIP Loan Documents"), a copy of which is attached hereto as **Exhibit "C"** with its prepetition lender, JP Acquisition. Pursuant to the DIP Loan Agreement, JP Acquisition has agreed to provide post-petition financing to Keys in excess of its revenues (which constitute JP

Acquisition's Cash Collateral) on essentially the same terms as agreed to in the Prepetition Loan Documents.

28.     The terms of the proposed DIP Financing are set out below:

| | |
|---|---|
| Amount: | $1.5 million is total amount to be borrowed. $1.0 million will be borrowed on an interim basis. |
| Interest Rate: | Prime plus two percent (2%) |
| Availability: | Immediate |
| Lender Protection: | • Lien pursuant to Section 364(d) and Superpriority Claim pursuant to Section 364(c). |
| | • No cross-collateralization or rollover of prepetition loan into a post-petition loan |
| | • Liens per DIP financing are junior to funds held by Wells Fargo to secure letters of credit |
| Release: | The Debtor releases claims related solely to the debtor-in-possession financing and validates only those liens granted by this Court with respect to the debtor-in-possession financing. In connection with Debtor's use of Cash Collateral, Debtor releases prepetition claims and acknowledges Senior Lender's Pre-Petition liens, subject to the right of an unsecured creditors' committee to investigate such claims and liens. |
| Carveout: | Yes: $100,000 for all professionals |
| Other Requirements: | Plan filed by May 1, 2008. Confirmation of Plan by August 1, 2008. |
| Budget: | Yes. DIP Loan and Cash Collateral stipulation require adherence to Budget. |
| Undersecured | Keys acknowledges Senior Lender is undersecured, based upon most recent internal valuations. |
| Fees: | $50,000 Commitment Fee |

29.     The DIP Loan Agreement provides to Keys sufficient additional liquidity to ensure that it will be able to operate with little, if any, disruption in Keys' business operations. In so doing, Keys ensures that it can maintain a going concern value and can hopefully emerge

quickly from its chapter 11 proceeding. By filing its chapter 11, Keys hopes to restructure its debt and provide its creditors with the best possible resolution. While neither JP Acquisition nor the Debtor's unsecured creditors have agreed to the terms of a plan of reorganization, Keys is nonetheless hopeful that it can move rapidly toward a plan of reorganization that has creditor support. However, absent the proposed DIP Financing and the use of Cash Collateral, Keys' operations will falter and any chance for a recovery by unsecured creditors will be lost.

30.    In making the decision to seek financing from JP Acquisition, Keys considered many factors. First, JP Acquisition held secured senior priority liens on substantially all of Keys' assets, and Keys believes these liens are valid and properly perfected. Second, JP Acquisition's preexisting knowledge of Keys' business operations provides significant benefits, including but not limited to the speed with which JP Acquisition could provide new financing beyond the use of Cash Collateral.  Likewise, JP Acquisition's knowledge of the business and prior due diligence allowed Keys to avoid paying a new lender to perform due diligence as a pre-condition to evaluating whether it wanted to make a new loan. Third, JP Acquisition already has in place a mechanism for postpetition funding. Fourth, the fees under the DIP Loan Agreement are minimal, and the interest rate is reasonable and accrues without immediate payment, all of which is beneficial to Debtor's cash flow.  Finally, Keys was unable to obtain alternative postpetition financing proposals from other lenders through credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), unsecured credit allowable under Bankruptcy Code sections 364(a) and 364(b), or with priority over any and all administrative expenses of the kind specified in Bankruptcy Code sections 503(b) or 507(b), or credit secured by liens on the Debtor's assets junior to the liens of JP Acquisition as the prepetition secured lender, as contemplated by Bankruptcy Code section 364(c)(3). As a practical matter, because Keys, like

other exercise equipment manufacturers, will be in its slow season during the next few months and will likely be cash flow negative for some or all of that time, no new lender is likely willing to consider any type of financing other than perhaps exit financing at the time Keys emerges from its chapter 11.

31.     Keys believes that the proposed DIP Financing will enable it to preserve and maintain the value of the estate by, among other things, stabilizing operations and retaining employees and critical relationships with vendors and suppliers.  Moreover, access to the DIP Financing and use of Cash Collateral on an interim basis is necessary to avoid immediate and irreparable harm to Keys pending a final hearing.

## IV.
## REQUESTED RELIEF

32.     The Debtor requests approval of the DIP Financing which includes, among other terms: (a) superpriority administrative expense claim status for all obligations owing under the DIP Financing; (b) automatically perfected liens on all property of the Debtor; (c) Keys' agreement to use the DIP Financing in accordance with a budget and the terms of the DIP Loan Documents; (e) payment of Senior Lenders' reasonable expenses, such as Senior Lender's reasonable legal fees and expenses, which payments Keys believes in its business judgment to be consistent with the standard practice for postpetition debtor in possession financing transactions, reasonable in size and nature and consistent with market rates; (e) vacating and modifying the automatic stay imposed by section 362, to the extent applicable, to allow Keys to implement and effectuate the DIP Financing and the transactions contemplated thereby[3]; and (f) scheduling a

_____

[3] The automatic stay is vacated only with respect to the post-petition DIP Loan Agreement.  Hence, the Senior Lender may offset collateral securing its post-petition DIP Financing in the Event of a Default. Keys has five days to seek relief from this Court if it disputes an Event of Default occurred.  The stay is not modified with respect to the Senior Lender's pre-petition Working Capital Facility.

final hearing (the "Final Hearing") to consider the relief requested in this Motion and approving the form of notice with respect to the Final Hearing.

**V.**

**BASIS FOR RELIEF REQUESTED**

**A.      The Court Should Authorize the Use of Cash Collateral.**

33.      Keys has an immediate need for use of the Senior Lender's Cash Collateral.  Keys requires the use of Cash Collateral to be able to pay operating expenses, including payroll, to ensure its continued viability.

34.      Bankruptcy Code section 363(c)(2) provides that the Debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  The Senior Lender, in its capacity as the prepetition lender, has consented to Keys' use of Cash Collateral on the terms and conditions set forth in the Interim Order.  Those terms and conditions are straightforward and reasonable.  Keys provides a replacement lien as adequate protection for use of Cash Collateral.  This replacement lien is subordinate to the lien securing the DIP Financing.  Keys, as a condition of using Cash Collateral, must operate within the Interim Budget for the period covered by the Interim Order and will request use of Cash Collateral pursuant to its Final Budget at the Final Hearing.

35.      Based on the foregoing, Keys requests that the Court authorize the Debtor to use the Cash Collateral in accordance with the terms set forth in the Interim Order.

**B.      The DIP Financing Should Be Approved.**

36.      Section 364 of the Bankruptcy Code provides bankruptcy courts with the power to authorize postpetition financing for a chapter 11 debtor in possession.  *See In re Vineyard Bay Dev. Co.,* 132 F.3d 269, 272 (5th Cir. 1998); *see also In re Pro Set, Inc.,* 193 B.R. 812, 814

(Bankr. N.D. Tex. 1996) (authorizing debtor to incur postpetition indebtedness under § 364); *In re Defender Drug Stores, Inc.,* 126 B.R. 76, 81 (Bankr. D. Ariz. 1991) ("Having recognized the natural reluctance of lenders to extend credit to a company in bankruptcy, Congress designed § 364 to provide `incentives to the creditor to extend post-petition credit'."). The incentives enumerated in section 364 are not intended to be an exhaustive list of the inducements that a court may grant. *Id.*. It is not uncommon for a court to approve a lending arrangement containing terms not specified in or that exceed those specified in section 364. *Id.*

37. If a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the Court, after notice and a hearing, may authorize the debtor to obtain credit or incur debt (a) with priority over any or all administrative expenses of the kind specified in Bankruptcy Code section 503(b) or 507(b); (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien. *See* 11 U.S.C. § 364(c).

38. To show that credit required cannot be obtained on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by section 364(c) of the Bankruptcy Code. *See Bray v. Shenandoah Fed. Savs. & Loan Assn. (In re Snowshoe Co),* 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Garland Corp.,* 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980); *In re Crouse Group, Inc.,* 71 B.R. 544, 549 (Bankr. E.D. Pa.), *aff'd,* 75 B.R. 553 (E.D. Pa. 1987) (opining that a debtor seeking unsecured credit under § 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to § 364(b)). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Snowshoe,* 789 F.2d at 1088. Moreover, where few lenders are likely to be able and willing to extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct [an] exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd, Anchor Says. Bank FSB V. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (ND. Ga. 1989).

39.     To determine whether credit obtained may be granted under section 364(c) of the Bankruptcy Code, courts generally consider three factors demonstrating that: (a) the debtor cannot obtain credit unencumbered or without superpriority status, (b) the credit transaction is necessary to preserve the assets of the estates, and (c) the terms of the credit agreement are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender. *See Crouse Group,* 71 B.R. at 549.

40.     If a debtor is unable to obtain credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien (i.e. a "priming lien"). 11 U.S.C. § 364(d). As set forth in the proposed Interim Order,[4] the liens granted to secure the obligations of the DIP Financing will prime the existing liens of the DIP Lender, who is also the prepetition lender, and therefore, JP Acquisition, in its capacity as pre-petition lender, has consented to subordinate its pre-petition lien to the post-petition lien securing the DIP Financing. The Debtor believes that JP Acquisition would not have consented to the priming of its pre-petition liens under any other circumstance.

41.     As set forth above, Keys has an immediate need to obtain financing to ensure that it has sufficient working capital and liquidity to continue operations and thereby preserve and maintain value of its estate. Accordingly, the circumstances demonstrate that the requested relief is necessary and appropriate and should be authorized and approved by the Court.

---

[4] The proposed Interim Order is attached as **Exhibit "D"** to this Motion.

42.     Keys' negotiations with the JP Acquisition were extensive, vigorous, in good faith and at arm's length.  At the conclusion of these negotiations, Keys determined to enter into the proposed DIP Loan Agreement in the exercise of its sound business judgment.

43.     The financing under the DIP Financing provides new liquidity to Keys and will enable the Debtor, *inter alia,* to (a) minimize disruption to Keys' businesses and ongoing operations, (b) fund issuance of letters of credit by Wells Fargo (subject to the Court's approval of the Wells Fargo postpetition credit facility) to pay overseas vendors and continue the flow of inventory; (c) preserve and maximize the value of Keys' estate for the benefit of all Keys' creditors, and (c) avoid immediate and irreparable harm to Keys, its creditors, its customers and its employees.

**C.     The Court Should Authorize the Debtor to Provide Adequate Protection.**

44.     Section 363(e) of the Bankruptcy Code provides that, upon request of an entity that has an interest in property to be used by the debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. 11 U.S.C. § 363(e).

45.     What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor,* 808 F.2d 1393, 1396-97 (10th Cir. 1987); *In re Martin,* 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello,* 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The focus of adequate protection is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. 11 U.S.C. § 361; *see In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

46.     In exchange for the use of Cash Collateral, and the use, sale or lease of other collateral authorized by the interim order, Keys has agreed to provide adequate protection to the Senior Lender for the diminution in value of its interest in the collateral (including Cash Collateral). To that end, the Debtor, and JP Acquisition have negotiated, and the Debtor requests

that the Court approve, as of the Petition Date, a replacement lien on all assets of Keys, which lien will be primed by JP Acquisition's lien securing its post-petition DIP Financing.

47. Keys believes that the proposed adequate protection, including the proposed adequate protection payments, is fair and reasonable. JP Acquisition has agreed that the adequate protection provided in the Interim Order is sufficient to allow Keys to use the Cash Collateral, and to use, sell or lease other collateral, to continue to conduct its business operations post petition.

48. Based on the foregoing, Keys requests that the Court authorize the Debtor to provide certain adequate protections in accordance with the terms set forth in the Interim Order.

**D.    Modification of the Automatic Stay Is Appropriate.**

49. Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition. 11 U.S.C. § 362(a). The proposed DIP Financing contemplates a modification of the automatic stay, to the extent applicable, as necessary to permit the Senior Lender to perform any act authorized or permitted under or by virtue of the Interim Order and DIP Financing, including if necessary, collecting accounts receivable if an Event of Default occurs and Keys' business operations effectively disintegrate. Pursuant to the DIP Financing, Keys and any creditors committee will have five days after notice of an Event of Default to seek an injunction or dispute the Event of Default. JP Acquisition has agreed this Court has jurisdiction to adjudicate any dispute over an Event of Default. Moreover, the so-called termination of the automatic stay is included by JP Acquisition in the DIP Financing out of an abundance of caution. JP Acquisition is not precluded by Bankruptcy Code section 362 from enforcing its remedies triggered by a post-petition default on a post-petition loan. [insert case?]. Put differently, the exercise of the remedies set out in the DIP Loan Agreement relate to a post-

petition obligation and thus are not necessarily included within the protections granted to a bankruptcy estate through Bankruptcy Code section 362.

50.     Stay modification provisions such as those provided in the proposed Interim Order are, in Keys' business judgment, reasonable and appropriate under the present circumstances. Accordingly, Keys requests that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order and DIP Loan Agreement.

**E.     Interim Approval of the DIP Financing Should Be Granted.**

51.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral pursuant to Bankruptcy Code section 363 and to obtain credit under Bankruptcy Code section 364 may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable to the debtor's estate, subject to the rights of parties in interest at the Final Hearing.

52.     The Court should schedule and conduct a preliminary hearing on the Motion and authorize Keys from and after the entry of the Interim Order until the Final Hearing to obtain credit under the terms of the DIP Financing and utilize Cash Collateral.

53.     In light of the circumstances described herein, obtaining the DIP Financing and the transactions contemplated therein on a consensual basis with the Senior Lender is in the best interest of the Debtor, its creditors, its customers and its employees. The Senior Lender has consented to the Debtor's use of Cash Collateral in exchange for the adequate protection as set forth herein and in the Interim Order. Even with the ability to use Cash Collateral under the Interim Order, however, the Debtor will require a drawdown on the DIP Financing during the

first week of Keys' chapter 11 proceeding to ensure Keys can honor its on-going customer obligations.

54.     Accordingly, Keys requests that the Court grant interim approval of the DIP Financing in accordance with the terms set forth in the Interim Order and DIP Loan Agreement.

**F.      Establishing Notice Procedures and Scheduling Final Hearing.**

55.     Notice of this Motion will be given to: (a) the United States Trustee; (b) counsel to JP Acquisition; (c) counsel to Wells Fargo, and (d) the parties included on Keys' list of twenty (20) largest unsecured creditors (collectively, the "Initial Notice Parties"). Under the circumstances, no further notice of the hearing on the Interim Financing is necessary.

56.     Keys further requests that the Court schedule the Final Hearing and authorize the Debtor to mail copies of the signed Interim Order, which fixes the time, date and manner for the filing of objections, to (a) the Initial Notice Parties; (b) any party that has filed prior to such date a request for notices with this Court; and (c) counsel for any official committee(s), if any. Keys requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

57.     No previous request for the relief sought herein has been made to this Court or any other court.

### VI.
### CONCLUSION

WHEREFORE Keys requests that the Court (i) grant the relief requested herein, (ii) enter an order substantially in the form of the proposed Interim Order attached hereto as **Exhibit "D"**; (iii) schedule a Final Hearing to approve the Final Order substantially in the form that shall be filed with the Court; and (v) grant such other and further relief as is just

Dated:  April  16, 2008

Respectfully submitted,

NELIGAN FOLEY LLP

By: /s/ Patrick J. Neligan, Jr.
    Patrick J. Neligan, Jr.
    State Bar No. 14866000
    pneligan@neliganlaw.com
    David Ellerbe
    State Bar No. 06530600
    dellerbe@neliganlaw.com
    Nancy Ribaudo
    State Bar No. 24026066
    nribaudo@neliganlaw.com

Republic Centre
325 N. St. Paul, Suite 3600
Dallas, Texas 75201
Telephone: (214) 840-5300
Facsimile: (214) 840-5301

PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR-IN-POSSESSION

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document has been served this 16th day of April, 2008 to the parties on each of the attached list, and the United States Trustee by e-mail, if known, and U.S. First Class Mail, postage prepaid.

/s/ Nancy Ribaudo_____
Nancy Ribaudo

**(EXHIBITS TO BE PROVIDED)**

# Keys Fitness- Master Service List Labels (4/16/08)

**Debtor**
Keys Fitness Products L.P.
4009 Distribution Drive
Suite 250
Garland, TX 75041

**Debtor's Counsel**
Patrick J. Neligan, Jr.
Neligan Foley LLP
325 N. St. Paul, Suite 3600
Dallas, Texas 75201

**United States Trustee**
William T. Neary
George F. McElreath
United States Trustee, Region 6
1100 Commerce Street, Room 976
Dallas, Texas 75242

**IRS**
Internal Revenue Service
1100 Commerce Street
Dallas, Texas 75242-1496

**United States Attorney**
Office of the U.S. Attorney
Northern District of Texas
3rd Floor, 1100 Commerce Street
Dallas, Texas 75242

**Attorney General**
Office of the Attorney General
1412 Main Street, Suite 810
Dallas, Texas 75202

**Secured Creditors**
JP KFP Acquisition, LLC
Jacobson Partners
595 Madison Avenue, Suite 3100
New York, NY 10022-1907

**JP KFP Acquisition, LLC Counsel**
Eric Kay
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, NY 10038

**JP KFP Acquisition, LLC Counsel**
William B. Finkelstein
Daniel I. Morenoff
Kirkpatrick & Lockhart et al. LLP,
1717 Main Street, Suite 2800
Dallas, TX 75201

**20 Largest Unsecured Creditors**
Qingdao Impulse Group Co.
Huashan 2 Road
Jimo, Qingdao, CHINA

Rexon Industrial Corp. Ltd.
261 Jen hwa Road
Tali, Taichung, CHINA

Tianjin Aolin Co., Ltd.
Tianjin, CHINA

Bank of America, N.A.
901 Main Street
66th Floor
Dallas, TX 75202

Norinco Armsports Co., Ltd.
7A Yue Tan Nan Jie
P.O. Box 2137
Beijing, CHINA

Macro Progress Ent. Co.
Most Perfectly Enterprise Co., Ltd.
Taiwan, CHINA

Josen International (HK)
HK Office Rm. 5209-10 52nd Floor
Hopewell Center, No. 183
Queen Road East
Wanchai, HONG KONG

Xiamen Ufit
Healthtech Co., Ltd.
Wutong, Huandao Road
Huli District Xiamen
Fujian Proviner

Ezfit Technology, Inc.
No. 9 Lane 262
Tong An Rd.
An Nan District
Tainan City

ABF Freight System, Inc.
P.O. Box 560005
Dallas, Texas 75356-0005

Iviva International Corp.
18-1F No. 199 Sec. 1
Taichung Kang Road
Taichung

YIH An Exnt. Co., Ltd.
Sec. 2, Chang Ping Rd.
Taichung

Icon Health & Fitness
1500 South 1000 West
Logan, UT 84321

Old Dominion Freight Line
P.O. Box 60908
Charlotte, NC 28260-0908

Apache Mills Inc.
P.O. Box 51005
Newark, NJ 07101-5101

Time Sourcing, Inc.
2648 Durfee Avenue
El Monte, CA 91732

Pro Staff
Box 5006
P.O. Box 1450
Minneapolis, MN 55485-5006

HSIN HWA Casting Co., Ltd.
Innofit, No. 8506
Shan Giao Lane
Chong, Yi Lee, Chupei City
HSIN CHU HSIEN

Quality Logistics Systems
3801 Pinnacle Point, Suite 100
Dallas, Texas 75211

Lynden International
P.O. Box 84167
Seattle, WA 98124

NOTICE OF APPEARANCE

**Counsel for Bank of America**
R. Michael Farquhar
J. Frasher Murphy
Winstead PC
1201 Alm St., Suite 5400
Dallas, TX 75270